IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 14, 2019

## STATE OF TENNESSEE v. DAVID DARRELL FLETCHER

**Appeal from the Circuit Court for Bedford County**
**No. 18404      Forest A. Durard, Jr., Judge**

_____

### No. M2018-01293-CCA-R3-CD

_____

A Bedford County jury convicted the defendant, David Darrell Fletcher, of aggravated burglary (count 1), first degree premeditated murder (count 2), and first degree felony murder (count 3), and the trial court imposed an effective sentence of life plus 10 years. On appeal, the defendant challenges the sufficiency of the evidence supporting his first degree murder conviction and several of the trial court's rulings. The defendant argues the trial court erred in admitting testimony regarding a statement he made to Amber Fletcher during a recorded phone call, in failing to designate three witnesses as accomplices as a matter of law and in failing to charge the jury accordingly, and in denying the defendant's motions for a change of venue and for a mistrial. After reviewing the record and considering the applicable law, we affirm the judgments of the trial court. However, we note, in merging the defendant's convictions in counts 2 and 3, the trial court failed to impose a sentence for the merged conviction of count 3. Because the conviction of count 3 carries a mandatory life sentence, a new sentencing hearing is not required, but we remand the case to the trial court for the entry of a completed judgment form as to count 3.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part and Remanded in Part**

J. ROSS DYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Christopher P. Westmoreland, Shelbyville, Tennessee, for the appellant, David Darrell Fletcher.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Robert J. Carter, District Attorney General; and Mike

Randles and Richard Cawley, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### *Facts and Procedural History*

This case arises from the gang-related shooting death of the victim, Angela Kibble, on September 14, 2015. For his participation in the crimes, a Bedford County grand jury indicted the defendant for aggravated burglary, first degree premeditated murder, and first degree felony murder. Tenn. Code Ann. §§ 39-13-202 (a)(1), (2); 39-14-403. Prior to trial, the defendant filed a motion for a change of venue and a motion to declare Lakisha Denham, Marie Eshbaugh, and Cory Eddings as accomplices. The trial court denied the motion for a change of venue and reserved its ruling on the motion to declare the witnesses as accomplices until hearing the proof presented at trial. The defendant proceeded to trial on February 12, 2018, where the parties presented the following evidence.

On September 6, 2015, Michael Sales, a member of the Crips street gang, murdered Capone Caruth, a member of the Gangster Disciples, in Fayetteville, Tennessee. *State v. Michael Domonic Sales*, No. M2017-01116-CCA-R3-CD (filed June 5, 2017). After committing the murder, Mr. Sales returned to Shelbyville, Tennessee where both he and his mother, the victim in this case, lived. Detective Joel Massey of the Fayetteville Police Department responded to the murder scene and observed a single gunshot wound to Mr. Caruth's head. With the assistance of Tennessee Bureau of Investigation (TBI) Agent Zachary Burkhart, Detective Massey arrested Mr. Sales in Shelbyville at approximately 11:30 p.m. on September 13, 2015. Shortly after, the defendant and his co-defendants entered the victim's apartment in search of Mr. Sales. When the victim failed to disclose Mr. Sales' whereabouts, Kevaris Kelso fired a single gunshot to the victim's head, and the group fled her apartment.

Two co-defendants, Antonio Taylor and Octavius Ransom, testified at trial. Before participating in the murder, Mr. Taylor met the defendant at a park in Tullahoma, Tennessee often frequented by members of the Gangster Disciples. Danny Allen, Desean Askins, Cory Eddings, Marie Eshbaugh, and Lakisha Denham were with Mr. Taylor at the park. While there, the defendant stated he wanted to "[g]o talk to [Mr.] Kelso" in Shelbyville. Mr. Taylor explained they wanted to ask Mr. Kelso "what Michael Sales said to him" because Mr. Sales "killed one of our friends." If the group found Mr. Sales, Mr. Taylor stated he planned "to jump on" him. Mr. Taylor stated he did not have a gun with him and did not see Mr. Eddings with a gun.

- 2 -

The group traveled to Shelbyville in two cars: Ms. Eshbaugh's maroon Nissan Rogue (the Rogue) and Ms. Denham's silver Chevrolet Malibu (the Malibu). According to Mr. Taylor, the defendant drove the Malibu with Mr. Taylor, Mr. Askins, and Ms. Denham. Ms. Eshbaugh drove the Rogue with Mr. Eddings and Mr. Allen. Once in Shelbyville, the two cars stopped at a Kangaroo gas station where Mr. Taylor, Mr. Eddings, and Mr. Allen went inside and made purchases. At trial, Mr. Taylor identified himself on surveillance footage obtained from the gas station. The two cars then traveled to Chase Gross's apartment looking for Mr. Kelso. Mr. Gross, driving a white Mercedes SUV (the Mercedes), then led the group to Mr. Kelso's apartment. The defendant was still driving the Malibu and Ms. Eshbaugh was driving the Rogue.

At Mr. Kelso's apartment, the group found Mr. Kelso, Mr. Ransom, Raheem Maxwell, and Allen Carney, among others. According to Mr. Taylor, Mr. Sales had been at Mr. Kelso's apartment earlier that night. While there, Mr. Sales bragged about killing Mr. Caruth and stated he planned to kill additional members of the Gangster Disciples. The defendant was upset Mr. Kelso allowed Mr. Sales to make the threatening statement, and he asked Mr. Kelso, "How you going to let Michael Sales come and say he just killed one and he coming to Tullahoma and kill 2 more." The defendant asked Mr. Kelso if he had a gun, but he did not. Instead, Mr. Carney handed a "chrome and black" gun to the defendant. The defendant gave the gun to Mr. Kelso who placed it in the front pocket of his hoodie.

The group then left Mr. Kelso's apartment in search of Mr. Sales. According to Mr. Taylor, "Everyone just left. Everyone was looking at [Mr.] Kelso, and [Mr.] Kelso just led the way." Because Mr. Taylor believed the group planned to beat up Mr. Sales if they found him, he asked Mr. Kelso, "[W]hat do you need a gun for?" Mr. Kelso did not respond. Mr. Taylor did not have or overhear any conversations with the defendant about what they would do to Mr. Sales if they found him. The group searched for Mr. Sales in the same three-car caravan from earlier in the night which included the Mercedes, the Rogue, and the Malibu: the defendant, Mr. Taylor, Mr. Askins, and Ms. Denham were in the Malibu; Mr. Eddings, Mr. Kelso, Mr. Allen, and Ms. Eshbaugh were in the Rogue; and Mr. Maxwell, Mr. Ransom, and Mr. Gross were in the Mercedes.

At trial, the victim's daughter, Lasheika Sales, noted the victim was Mr. Kelso's aunt. Accordingly, Mr. Kelso knew where the victim lived, and he directed the group to her apartment located at 800 Belmont Avenue, Shelbyville, Tennessee in the Oak Hill Village Apartments. Mr. Kelso directed the caravan to the parking lot of the neighboring apartment complex, the Southgate Apartments, and the three cars backed into parking spaces. The defendant, Mr. Askins, Mr. Allen, Mr. Kelso, Mr. Gross, Mr. Ransom, and Mr. Maxwell got out of their respective cars while Mr. Eddings, Ms. Eshbaugh, and Ms. Denham remained in the cars. As the men approached the victim's upstairs apartment,

the defendant told Mr. Kelso "to knock on the door and see if [Mr. Sales] is in there." Instead, Mr. Kelso kicked the door, but it did not open. As the victim began opening the door, Mr. Kelso forced his way inside, and the group followed.

Mr. Taylor stated the victim looked confused as she sat down on the couch. Mr. Kelso stood in front of the victim, and the defendant stood beside her. Mr. Kelso asked where Mr. Sales was, but the victim stated she did not know. After Mr. Kelso asked the victim a second time, he "pulled the gun out and pointed [it] to her head." Mr. Taylor told Mr. Kelson, "don't do nothing you are going to regret." Mr. Kelso, however, looked at the defendant and then shot the victim in the left temple. Mr. Taylor was shocked and "[t]here was nothing else I could do but just run." As the group ran, Mr. Kelso tried to "[t]oss the gun in [Mr. Taylor's] hand," but Mr. Taylor handed the gun back to him.

In the parking lot, the men dispersed into the three cars. The defendant, Mr. Taylor, and Mr. Askins got into the Malibu, and Ms. Denham drove them to Tullahoma and then Winchester. In Winchester, Mr. Taylor and the defendant briefly went inside their respective apartments before getting back in the Malibu. The group then drove to Fayetteville where Ms. Denham dropped the defendant and Mr. Askins off at an apartment. At approximately 3:00 or 4:00 a.m., Ms. Denham and Mr. Taylor ended the night at Ms. Denham's aunt's apartment.

For his involvement in the victim's death, Mr. Taylor was charged with aggravated burglary, first degree premeditated murder, and felony murder. He gave a statement to police on October 12, 2015, and subsequently wrote letters to police recanting the same after the defendant threatened both him and his family. Mr. Taylor explained the defendant threatened his family on Facebook and him while in jail. Specifically, after their arrests, Mr. Taylor, Mr. Allen, Mr. Askins, Mr. Gross, Mr. Kelso, Mr. Maxwell, and the defendant were in the "cage," or holding cell, together. The defendant said, "you know what is going to happen down the road if all of you wrote statements [and] testify." Mr. Taylor admitted several discrepancies existed between his statement, his letters, and his testimony at Mr. Kelso's and the defendant's trials. However, he stated his present trial testimony was truthful "[b]ecause what happened to [the victim] wasn't right and her daughters have to suffer for it. We went to look for her son. The [victim] had nothing to do with it."

Mr. Ransom then explained his involvement in the murder, noting he was at Mr. Kelso's apartment with Mr. Carney when the defendant arrived. Initially, Mr. Ransom testified he did not remember the defendant making a comment to Mr. Kelso while at the apartment. However, after reviewing his prior statement, Mr. Ransom recalled the defendant said something about "[Mr. Sales] killed one and said he would kill another and 2 more in Tullahoma."

Mr. Ransom left Mr. Kelso's apartment with the group in the Mercedes. He was the only person to exit the Mercedes at the victim's apartment, and he heard the defendant tell Mr. Kelso "to kick the door in." The defendant held the door open as the men filed into the apartment. Mr. Ransom was the last one inside. He heard Mr. Kelso ask the victim, "[W]here your son at?" He then heard a gunshot, and ran.

Cory Eddings also testified, stating he was currently in custody in Lincoln County for violating the terms of his community corrections sentence. He explained his relationships with those involved in both Mr. Caruth's and the victim's deaths, noting he grew up with Mr. Caruth and witnessed his murder. Both Mr. Eddings and Mr. Caruth were members of the Gangster Disciples along with Mr. Kelso, Mr. Gross, Mr. Taylor, Mr. Askins, and Mr. Allen, while Mr. Sales was a member of the Crips. Mr. Eddings attended Mr. Caruth's funeral in Fayetteville where he met the defendant, or "Day Day"/"Mac Day." Mr. Eddings had the defendant listed in his cell phone as "Mac Day."

Mr. Eddings testified that he went to the park in Tullahoma the night of the victim's murder in order to have sex with Ms. Eshbaugh. Though he interacted with the defendant, Mr. Askins, Mr. Taylor, Mr. Allen, and Ms. Denham, Mr. Eddings stayed in the Rogue with Ms. Eshbaugh for a majority of the 2 to 3 hours the group was at the park. As such, he did not see the defendant with a cell phone while they were there. Mr. Eddings explained that when the group left the park for Shelbyville they were going to find Mr. Kelso who would know where to find Mr. Sales in order "to jump on [Mr. Sales] or something."

As noted by Mr. Taylor, the two cars stopped at a Kangaroo gas station in Shelbyville. Mr. Eddings identified himself in a photograph and on the surveillance footage from the gas station, noting he was wearing a t-shirt depicting Mr. Caruth with the words, "Gone Too Soon." He also identified Mr. Allen on the surveillance footage. The two cars then drove to Mr. Gross' apartment because Mr. Gross "knew where to find [Mr.] Kelso," who knew where to find Mr. Sales.

Mr. Gross then led the group in his Mercedes to Mr. Kelso's apartment where everyone went inside. In total, there were about 12 or 13 people inside the apartment. A drawing of Mr. Kelso's living room with markings as to where Mr. Eddings and the defendant were sitting was entered into evidence. Mr. Eddings stated he overheard the defendant ask Mr. Kelso "something in the category of how he going to let Michael Sales tell him he got one, and was going to get 2 more or something in that category." Mr. Eddings was unsure if Mr. Kelso responded to the defendant's statement, but stated he did not see a gun while in the apartment. Mr. Eddings also denied having a gun.

The group left Mr. Kelso's apartment in search of Mr. Sales and eventually backed into parking spots at the Southgate Apartments. Mr. Eddings did not know who lived at the apartments or "what the game plan was," but he believed the group was still looking for Mr. Sales. While Mr. Kelso and Mr. Askins got out of the Rogue, Mr. Eddings remained inside with Ms. Eshbaugh and began "messing around" with her. He also believed Ms. Denham remained in the Malibu, but he could not see who got out of the Mercedes. He saw the group of men who exited the cars talk before walking behind the cars and disappearing for 5 to 10 minutes. When the men returned, Mr. Askins and Mr. Kelso got back in the Rogue with Ms. Eshbaugh and Mr. Eddings, and the defendant returned to the Malibu. The cars then "pulled off." Mr. Eddings did not ask anyone what happened during the 5 to 10 minutes when the group disappeared. He and Ms. Eshbaugh dropped Mr. Kelso off at his apartment in Shelbyville before driving back to Tullahoma where they rented a hotel room for the remainder of the night. Mr. Eddings noted he and the defendant exchanged phone calls throughout the evening but did not remember texting the defendant. He denied having the defendant's phone at any point during the night and stated he had not spoken with the defendant since.

Mr. Eddings asserted he learned of the victim's death the day after the murder. He then read to the jury a Facebook post he made after learning the same: "I would never wish dead on a man's mother. Through whatever I know God will handle the evil in his favor, and it always show because they end up in jail or hell. I'm praying for both families."

During cross-examination, Mr. Eddings discussed the statement he gave to Agent Burkhart on September 19, 2015. In the statement, Mr. Eddings said Ms. Denham was driving the Malibu on the night of the murder. At trial, however, Mr. Eddings stated he was unsure who drove the Malibu from Tullahoma to Shelbyville. Mr. Eddings stated he did not hear the defendant threaten anyone on September 13, 2015, noting the defendant was not threatening when he made a statement to Mr. Kelso regarding Mr. Sales's comment about killing members of the Gangster Disciples.

On the day of Mr. Caruth's funeral, Mr. Eddings discussed finding Mr. Sales with the defendant, Mr. Taylor, Mr. Askins, and several others. However, while at the park, he did not recall having a similar conversation, though he believed the group was going to Shelbyville to find Mr. Kelso in order to find Mr. Sales. Mr. Eddings stated Ms. Eshbaugh did not know what was going on, "[s]he [was] just driving," but noted the group did not discuss going to a party. He recalled testifying at Mr. Kelso's trial that he did not get out at the victim's apartment because he did not want to be a part of what they were doing, again believing the group was looking for Mr. Sales. Finally, Mr. Eddings stated he was not facing prosecution for the victim's death, though he was recently sentenced in federal court for being a felon in possession of a firearm.

Ms. Denham and Ms. Eshbaugh both testified regarding their involvement with the defendant and his co-defendants on September 13, 2015. That evening, Mr. Askins asked Ms. Denham to give him a ride from Fayetteville to Tullahoma. Though she did not want to go, Ms. Denham let Mr. Eddings drive her Malibu to Tullahoma along with Mr. Taylor and Mr. Askins. Upon arriving in Tullahoma, the group met the defendant and Ms. Eshbaugh at an apartment. The defendant wanted to go to Shelbyville, but Ms. Denham did not know why. She overheard the defendant on a phone call asking if he needed to be "strapped." The defendant asked Ms. Denham to drive to Shelbyville, but she refused. As a result, the defendant drove her Malibu to Shelbyville, and Ms. Denham, Mr. Askins, and Mr. Taylor rode with him.

As previously noted, the group stopped at a gas station before going to Mr. Gross's apartment. Ms. Denham identified her Malibu and Ms. Eshbaugh's Rogue on the gas station surveillance footage presented at trial. When the Mercedes, Malibu, and Rogue left Mr. Gross's apartment, the defendant was still driving the Malibu. The caravan parked at Mr. Kelso's apartment. Ms. Denham and Ms. Eshbaugh remained in their cars as the men in the group went inside. The defendant took Ms. Denham's keys. He returned and instructed everyone to go inside.

Once inside Mr. Kelso's apartment, Ms. Denham saw a gun on the kitchen counter and heard Mr. Kelso say, "Leave the gun for protection." Before leaving the apartment, Ms. Denham also heard Mr. Kelso say, "Let's go see what the brother is doing." The group, which included the defendant, Mr. Allen, Mr. Askins, Mr. Taylor, Mr. Eddings, Mr. Gross, Mr. Kelso, Ms. Eshbaugh, and a few others, then left the apartment. Ms. Denham got back in the Malibu with Mr. Askins and Mr. Taylor as the defendant drove to the Southgate Apartments along with the Rogue and the Mercedes. All three vehicles backed into parking spaces in order to be facing the street. Ms. Denham, Ms. Eshbaugh, and Mr. Eddings remained in their cars as the others disappeared out of sight. After 5 to 10 minutes, the group of men returned to the cars. The defendant, Mr. Askins, and Mr. Taylor got back in the Malibu, and the defendant asked Ms. Denham to take him to Tullahoma. Ms. Denham complied and followed the defendant's directions back to Tullahoma. During the drive, Ms. Denham listened to the conversation between the defendant, Mr. Taylor, and Mr. Askins. She recalled the defendant saying, "Kelso beat that n*****'s ass." Ms. Denham asked, "What n*****," and the defendant responded, "the sh** that happened in Fayetteville." Ms. Denham did not think the defendant was upset during the conversation and seemed to approve of what Mr. Kelso did.

Upon arriving in Tullahoma, the group consisted of Ms. Denham, Ms. Eshbaugh, Mr. Eddings, Mr. Allen, Mr. Askins, Mr. Taylor, and the defendant. Ms. Denham, the defendant, Mr. Taylor, and Mr. Askins soon left Tullahoma and drove to Winchester. In

Winchester, they went to an apartment complex where the defendant and Mr. Taylor went inside different apartments. The defendant took Ms. Denham's keys with him. Mr. Askins attempted to get the keys from the defendant, but instead returned to the car with the defendant. Mr. Taylor also returned, and Ms. Denham drove the group to Fayetteville. She dropped the defendant and Mr. Askins off at an apartment before going to her aunt's apartment with Mr. Taylor, asserting they did not discuss what happened. She did not learn about the murder until she was questioned by police.

During cross-examination, Ms. Denham explained the defendant "was upset and aggressive" on the night of the murder and noted she had not met the defendant previously. Ms. Denham stated she "basically had no choice" but to let the defendant drive her car because she had been drinking and "nobody else wanted to drive." During redirect examination, Ms. Denham reiterated she did not ask the defendant for her keys in order to leave the situation because he was "very aggressive," and even Mr. Taylor and Mr. Askins seemed scared of the defendant and were unable to get her keys from him. Ms. Denham did not want to go to Shelbyville or Tullahoma, but they refused to take her home when she asked.

Ms. Denham stated she was not charged in the victim's death. During his investigation, Agent Burkhart contacted Ms. Denham, and she provided three statements to law enforcement. Ms. Denham reviewed her first statement given on September 21, 2015, before answering questions about the same. Ms. Denham clarified she met Mr. Taylor the day before the murder and thought he was trying to hook up with her that night. She also explained her statement was inaccurate where she stated the defendant got in another car after they stopped at the gas station in Shelbyville.

After reviewing her statement dated September 23, 2015, Ms. Denham again answered questions about the same. In that statement, Ms. Denham admitted she was not honest in her first statement, noting: "The reason I was dishonest about certain things was because I was scared. The guys involved in this whole thing have threatened my life[,] and they told me they were going to kill me." Ms. Denham explained she did not know what occurred on the night in question, but she had been threatened "[b]ecause it was going around that someone had been murdered in Shelbyville. And on the streets, they was (sic) saying it had something to do with them. I didn't know for sure, and someone called and was threatening me."

In her final statement, given November 5, 2015, Ms. Denham admitted she lied in her September 23 statement because she stated Mr. Taylor did not stay with her at her aunt's house when, in fact, he did. While still at her aunt's house, the defendant and another man came to speak with Mr. Taylor. The three left briefly, and Mr. Taylor

- 8 -

returned.  Ms. Denham stated she has not seen or spoken to the defendant since the night of the murder.

Ms. Eshbaugh also testified, stating that on September 13, 2015, she and Mr. Eddings planned to go to a party in Shelbyville.  Ms. Eshbaugh drove the Rogue to the Carver Apartments in Tullahoma with Mr. Eddings where they met the defendant, Mr. Taylor, Ms. Denham, and a few others.  Ms. Eshbaugh had not met the defendant before but knew him as "Day Day."  After staying in Tullahoma for approximately 15 minutes, the group left for the party in Shelbyville.  Ms. Eshbaugh stated she did not really want to go, but the men said they would pay for her gas if she gave them a ride.  Only Mr. Eddings rode with Ms. Eshbaugh, while the defendant drove Ms. Denham's Malibu.

After arriving in Shelbyville, both cars stopped at a gas station.  At trial, Ms. Eshbaugh identified her Rogue and Ms. Denham's Malibu on the surveillance footage.  She also identified Mr. Taylor and Mr. Eddings on the video.  Upon leaving the gas station, she followed the defendant, who was driving the Malibu, to Mr. Gross's apartment where Ms. Eshbaugh remained in her car.  Eventually, everyone returned to the cars and Mr. Gross led them to Mr. Kelso's apartment at the Park Trail Apartments.  When the group left Mr. Kelso's apartment, Ms. Eshbaugh, Mr. Eddings, and Mr. Kelso got in the Rogue.

Ms. Eshbaugh led the three cars, believing they were finally going to a party.  She explained Mr. Kelso got in her car in order to tell her where to go "because he knew where [they] were going."  Mr. Eddings was texting on his cell phone as they drove, but Ms. Eshbaugh did not know with whom he was texting.  When the group arrived at the "final set of apartments," the defendant told Ms. Eshbaugh to back into the parking spot so "it would be easier to get out and leave."  The defendant also told her that "whenever we get ready to leave to follow the white SUV and go to the right."  Everyone got out of the cars except for Ms. Eshbaugh, Mr. Eddings, and Ms. Denham, who had moved to the driver's seat of the Malibu.  The men "ran around the corner to the left side of the vehicles and disappeared."  Ms. Eshbaugh thought they went inside to "check on the party to see if everything was okay before letting us females go in."  However, she waited in her car for approximately 10 to 15 minutes before the group ran back.  Ms. Eshbaugh followed the Mercedes back to Mr. Kelso's apartment where he left the group.  As Ms. Eshbaugh drove back to Tullahoma, she asked Mr. Eddings questions, but he did not respond because he was on the phone.

In Tullahoma, Ms. Eshbaugh drove to The Village where they met the defendant, Mr. Taylor, and Ms. Denham.  Ms. Eshbaugh felt threatened after the defendant told her "not to tell anybody that we were in Shelbyville that night.  They didn't need to know

why we were here or if we were here, and that if anybody found out, it would not be pretty."

During cross-examination, Ms. Eshbaugh stated she wanted to hook up with Mr. Eddings on September 13, 2015. When she met him, she noticed he had a cell phone and a gun, but she did not see the gun once in Shelbyville or when inside Mr. Kelso's apartment. Though the gun concerned her, she continued to hang out with Mr. Eddings, and the two spent the night together in a hotel. She believed she parked near the victim's apartment around 2:00 or 3:00 a.m. and returned to Tullahoma between 4:00 and 5:00 a.m. However, she noted a receipt documenting she was at the gas station at approximately 11:30 p.m. would be a more accurate time of the events than her memory. Prior to September 13, Ms. Eshbaugh had not met the defendant and had not spoken to him since.

Ms. Eshbaugh also addressed the two statements she provided to Agent Burkhart concerning her involvement in the murder. In the statements, Ms. Eshbaugh noted the defendant was driving a car. Mr. Eddings stayed in the car with her when they parked outside the victim's apartment, but he got out for about 2 or 3 minutes and told her to follow the Mercedes when the men returned to the cars. Ms. Eshbaugh stated she was previously told to follow the Mercedes by the defendant. Ms. Eshbaugh stated Mr. Eddings placed a black and silver gun in her glove box when he got in her car, but she did not see Mr. Eddings with the gun at Mr. Kelso's or the victim's apartment. Ms. Eshbaugh thought Mr. Eddings took the gun out of the glove box while at Mr. Gross's apartment. However, in her statement she noted Mr. Eddings took the gun out of the glove box and put it in his jacket before going into Mr. Kelso's apartment. Ms. Eshbaugh affirmed she was and is scared of the defendant.

Two of the victim's neighbors testified as to their memory of September 13, 2015. Betty Robertson lived next door to the victim at the Oak Hill Village Apartments. On September 13, she fell asleep around 11:30 p.m. but awoke to a "pop" that "sounded like a firecracker" around 12:11 or 12:14 a.m. Charles Colon lived in the apartment below the victim and identified their respective apartments in a photograph at trial. Mr. Colon went to sleep around 11:00 or 11:45 p.m. Prior to 1:00 a.m., he heard "a whole bunch of footsteps running down the stairs." The next morning, Mr. Colon noticed the victim's apartment door was open, and he began calling her name. When she did not reply, Mr. Colon went to her apartment and saw the victim "sitting on the couch with blood coming down her head." Mr. Colon ran to the maintenance office, and Thomas Mullins, the maintenance supervisor for the complex, called 9-1-1 at approximately 7:15 a.m.

Officer Tory Moore of the Shelbyville Police Department responded to the 9-1-1 call. Mr. Mullins directed Officer Moore to the victim's apartment. The door was open,

and Officer Moore observed the victim sitting on the couch in an unnatural position. Inside, he observed "a pool of blood on [the victim's] blouse that was running from a wound in her head that was clearly a penetrating wound. It appeared she had been there a while based on her color." Officers Jeff Goodrich and Mitchell Warren joined Officer Mullins at the scene and the three swept the residence, noting no one else was in the apartment and nothing appeared out of place. Officer Mullins secured and photographed the scene and created a crime scene log.

Lieutenant Brian Crews of the Criminal Investigation Division (CID) of the Shelbyville Police Department and Detective Sam Jacobs also responded to the victim's apartment on the morning of September 14, 2015. They saw the deceased victim on the couch with a gunshot wound to her head. Lieutenant Crews noted "a significant amount of blood" and stated it "looked like a hit" as there were no signs of a robbery or theft. Lieutenant Crews, however, did not observe any damage to the victim's door. Additionally, he knew the victim was the mother of Michael Sales, who was involved in a murder in Fayetteville the prior week. Because he believed the murders to be related, Lieutenant Crews contacted the TBI.

Detective Sam Jacobs photographed the scene and assisted TBI Agents Zachary Burkhart and Caleb Utterback in collecting evidence, including a shell casing located by the back door and a bullet fragment located near a table in the living room. Detective Jacobs indicated the location of the evidence in photographs of the victim's apartment. Lieutenant Crews also identified numerous photographs depicting the apartment building, the victim, numerous views of her apartment including the living room, the door, and the balcony, and a Hornady .40 caliber spent shell casing found near the back door of the apartment.

On September 15, 2015, Donald Whitaker contacted Lieutenant Crews and informed him that he was at the Kangaroo gas station on September 13, 2015, and observed men who might have been involved in the victim's murder. As a result, Lieutenant Crews instructed Detective Jacobs to obtain and review any surveillance footage available from the gas station. The video footage corroborated Mr. Whitaker's tip and enabled Lieutenant Crews to identify several potential suspects, including: the defendant, Mr. Allen, Mr. Askins, Mr. Taylor, Mr. Eddings, Mr. Gross, Mr. Kelso, Mr. Ransom, Mr. Maxwell, Mr. Carney, Ms. Eshbaugh, and Ms. Denham.

Detective Jacobs also gathered surveillance footage from various businesses in the area and tracked the Rogue and the Malibu throughout Shelbyville on September 13, 2015. He compiled the pertinent video footage into one sequential video stream and created a list of each clip, noting the date, time, location, and a brief description of the

captured footage. As the video played for the jury at trial, Detective Jacobs described the same.

The video begins with the Rogue and Malibu at the Kangaroo gas station at approximately 11:29 p.m. Mr. Taylor and Mr. Allen are seen exiting the Malibu and entering the gas station. Mr. Eddings is seen exiting the Rogue wearing a t-shirt with a picture and the words "Gone Too Soon." Detective Jacobs thought the t-shirt was relevant to Mr. Caruth's murder that occurred the previous week. Inside the gas station, Mr. Taylor, Mr. Allen, and Mr. Eddings purchased items, and Mr. Allen is seen handing money to Mr. Eddings. As a result, Detective Jacobs believed the Rogue and the Malibu were traveling together. Three receipts showing the purchases made by Mr. Taylor, Mr. Allen, and Mr. Eddings were entered into evidence.

As the video continues, Mr. Eddings is seen pumping gas into the Rogue. The two cars left the gas station at approximately 11:40 p.m. From an overhead view, the vehicles are seen passing the Dover Street area. According to Detective Jacobs, Mr. Gross lived at 407 Dover Street. Detective Jacobs further explained, approximately 40 minutes prior to the Malibu and the Rogue entering the Dover Street area, Mr. Sales was arrested at 411 Dover Street. After approximately 6 minutes, the three cars, beginning with the Mercedes followed by the Malibu and the Rogue, left the Dover Street area and presumably Mr. Gross's apartment. Though the caravan is lost on the video, it is eventually seen again driving away from the area of the Oak Hill Village Apartments at approximately 12:03 a.m.

The next video shows the Mercedes driving away from where Mr. Kelso lived at the Park Trail Apartments. The Mercedes is seen at the Kangaroo gas station at approximately 12:21 a.m. where Mr. Gross made a purchase. Mr. Gross is seen leaving the gas station at 12:25 a.m. and driving towards Mr. Kelso's apartment. Detective Jacobs admitted between 12:02 and 12:35 a.m., the three cars are not seen on video together. Instead, the Mercedes is seen independently and is the only vehicle seen during that time frame.

At approximately 12:35 a.m., the Rogue, the Malibu, and the Mercedes are seen driving away from the Park Trail Apartments, in that order. The caravan drives south and is ultimately seen driving towards the Oak Hill Village Apartments, where the victim lived, at approximately 12:40 a.m. The last video captured shows the caravan approximately 500 to 600 yards away from the Oak Hill Village Apartments. Detective Jacobs identified photographs of the Oak Hill Village Apartments and noted the Southgate Apartments were located just past the Oak Hill Village Apartments. He explained if the caravan parked in the Southgate Apartments, as Mr. Kelso admitted, the group would be very close to the victim's apartment. Detective Jacobs did not identify

the defendant on any of the videos and noted there is no video from the Oak Hill Village Apartments or the Southgate Apartments.

Special Agent Andrew Vallee, an expert in communication analysis and mapping, cellular forensics, and law enforcement use of communications records, provided a thorough overview of how cellular mapping is performed and then detailed the defendant's pertinent cell phone activity on September 13, 2015, using the maps he created as exhibits. At approximately 11:13 p.m., the defendant made an outgoing call from the Tullahoma area. The defendant placed three additional outgoing calls at 11:14 p.m., 11:14 p.m., and 11:18 p.m. as he traveled towards Shelbyville. Based upon two outgoing calls placed at approximately 11:22 p.m., the defendant had reached Shelbyville and the area of the Oak Hill Village Apartments. At 11:25 p.m., the defendant made two calls to Mr. Gross while in the same area. The next four calls placed by the defendant between 11:28 and 11:29 p.m. showed the defendant had traveled to the Shelbyville town center. While in the same area, the defendant received two calls from Ms. Fletcher at 11:38 p.m., a call from an unidentified number at 11:41 p.m., and a call from Mr. Eddings at 11:54 p.m. At the time of the calls, Agent Vallee explained the defendant was less than one mile from the victim's apartment. At 11:57 p.m., Mr. Eddings called the defendant which placed the defendant south of Shelbyville. When the defendant terminated the call 35 seconds later, he had moved north, but was still in the area surrounding the victim's apartment. At 12:19 a.m., the defendant placed two outgoing calls while in an area further north of the victim's apartment than the previous calls. Finally, at 1:36 a.m., the defendant made an outgoing call from the Tullahoma area.

Agent Vallee provided a chart mapping the defendant's cell phone from 11:30 p.m. on September 13, 2015, until 2:00 a.m. on September 14, 2015, which indicated the defendant traveled from Shelbyville to Tullahoma. At 2:03 a.m., the defendant made an outgoing call from the Estill Springs area which is between Tullahoma and Winchester. Agent Vallee explained 17.8 miles separates the areas of Shelbyville and Tullahoma. Another cellular map created by Agent Vallee detailed the cellular connections made by Mr. Allen, Mr. Eddings, Mr. Gross, and the defendant between 11:30 p.m. and 1:30 a.m. on the night of the victim's murder and portrayed the location of each person at the time of the connections.

On cross-examination, Agent Vallee noted he also examined a Verizon Samsung flip phone during his investigation but determined it was not used on September 13, 2015. He clarified the cell phone records previously discussed were for a cell phone registered to the defendant, though he did not know if the defendant was the person actually using the phone on the night in question. Further, he explained he did not know every phone number that the defendant dialed or received calls from on September 13 or 14. Agent Vallee stated the defendant and Mr. Allen did not communicate via cell phone

on the night of the murder, noting he only analyzed the defendant's records in this investigation. He further explained his mapping did not include for whether the phone calls were answered by the intended recipient.

Agent Burkhart detailed his involvement in both Mr. Caruth's and the victim's murder investigations. He assisted the Fayetteville Police Department in locating Mr. Sales after Mr. Caruth's murder. In doing so, Agent Burkhart spoke with the victim on September 10, 2015, at her apartment. At approximately 11:15 or 11:30 p.m. on September 13, 2015, Agent Burkhart participated in the arrest of Mr. Sales on Dover Street in Shelbyville. The next morning, Lieutenant Crews asked Agent Burkhart to come to the Oak Hill Village Apartments believing the victim's murder could be "possible retaliation" for Mr. Caruth's murder. Agent Burkhart identified the victim upon his arrival, collected evidence from the crime scene, and photographed the scene.

During the initial investigation, Agent Utterback and members of the violent crime scene team arrived at the scene along with members of the Shelbyville Police Department. Shoe prints were found during a cursory examination, and Agent Miranda Gaddes was contacted as a result. Agent Burkhart located a projectile in the living room of the apartment and a shell casing near the back door. He created a diagram of the scene and collected sunflower seeds, cigarette butts, and the victim's cell phone.

After concluding the initial investigation of the victim's apartment, Agent Burkhart transported the collected evidence to TBI Special Agent Steven Kennard. Special Agent Kennard submitted the evidence to the TBI headquarters in Nashville. The cigarette butts and sunflower seeds were submitted to the DNA Serology Unit and the projectile and spent cartridge case to the firearms unit.

Agent Burkhart spoke with Detective Massey of the Fayetteville Police Department regarding the potential connection between the victim's death and Mr. Caruth's death. By the end of the day on September 14, Agent Burkhart was actively working with the Fayetteville Police Department as they believed the murders were connected. Throughout the initial stages of the investigation, Mr. Eddings continued to surface as a potential suspect. When Agent Burkhart learned Mr. Eddings was captured on the surveillance footage from the gas station, he spoke with Mr. Eddings, who identified himself in the footage and provided the names of additional people of interest, including the defendant, Mr. Kelso, and "a few women."

As the investigation progressed, Agent Burkhart interviewed Ms. Denham, Ms. Eshbaugh, and Mr. Kelso. Agent Burkhart conducted Mr. Kelso's interview with Agent Russ Winkler. Prior to the interview, Agent Gaddes advised they look for Reebok Allen Iverson shoes as a possible shoe involved at the crime scene. Accordingly, during Mr.

Kelso's interview, Agent Burkhart collected a pair of Reebok Allen Iverson shoes from Mr. Kelso that were subsequently processed by Agent Gaddes. During Ms. Eshbaugh and Ms. Denham's interviews, the two women identified their cars in the surveillance footage. Ms. Eshbaugh also took Agent Burkhart to the Southgate Apartments where the cars had parked that evening -- approximately 100 yards from the victim's apartment.

Agent Burkhart and officers from the Shelbyville Police Department, including Detective Jacobs, interviewed Mr. Kelso a second time while he was incarcerated in Pennsylvania. After being Mirandized, Mr. Kelso confessed to shooting the victim. Additionally, after interviewing Mr. Taylor and Ms. Denham, Agent Burkhart learned the gun used in the victim's murder might be in the Elk River in Fayetteville, Tennessee. However, a sweep of the river did not produce a gun. Agent Burkhart also obtained the cell phones of the defendant, Mr. Eddings, and Mr. Gross. He noted both Mr. Eddings and the defendant's cell phones were forensically searched.

Agent Burkhart detailed his interviews with the defendant and Ms. Fletcher. According to Agent Burkhart, Ms. Fletcher requested an interview during which she received numerous phone calls from the defendant. Agent Burkhart explained Ms. Fletcher "was crying, she seemed scared and her phone kept buzzing. And she said something to the effect of [']he's going to keep calling.[']" As a result, Agent Burkhart directed Ms. Fletcher to answer the defendant's call and place the call on speaker phone. Agent Burkhart heard the defendant threaten Ms. Fletcher during the call. Ms. Fletcher asked Agent Burkhart about witness protection programs, and Agent Burkhart encouraged her to consider moving. At the conclusion of the interview, Agent Burkhart reduced Ms. Fletcher's statement to writing which she reviewed, edited, and signed. Agent Burkhart denied threatening or intimidating Ms. Fletcher during the interview.

During cross-examination, Agent Burkhart stated Ms. Fletcher contacted him approximately one month after she gave her statement and indicated it was not true. Agent Burkhart, however, did not meet with Ms. Fletcher again. He explained:

> In the first interview, this lady was scared out of her mind. She had been threatened in the middle of that investigation. She had also left for Ohio. She did contact me and talk to me about that statement. I told her that that was her -- her statement and her written statement, and at that time, no other statement was taken.

Prior to interviewing Ms. Fletcher, Agent Burkhart interviewed the defendant on September 30, 2015, noting the defendant and Ms. Fletcher's statements were similar. During the interview, the defendant disclosed he is a member of the Gangster Disciples and his street name is "Mac Day" and "Divy Odyssey." The defendant stated he attended

- 15 -

Mr. Caruth's funeral with "Black" and "Gold"[1] where he met Mr. Eddings, and the two exchanged phone numbers. The defendant stated he knew Mr. Kelso, but he did not know Mr. Gross or Mr. Sales. The defendant admitted to hanging out with Mr. Taylor and Ms. Denham on September 13, 2015. The defendant stated he was driving Ms. Denham's car because she had been drinking. The defendant denied knowing where Shelbyville was located but stated he may have driven through it on his way to Nashville. At the conclusion of the interview, the defendant reviewed and signed a written statement which was entered into evidence.

Agent Burkhart began arresting individuals for the victim's murder on October 8, 2015, including: the defendant, Mr. Allen, Mr. Askins, Mr. Taylor, Mr. Gross, Mr. Kelso, Mr. Ransom, and Mr. Maxwell. At the time of the arrests, Agent Burkhart knew Mr. Kelso fired the shot that killed the victim. After his arrest, the defendant asked to speak with Agent Burkhart at the Bedford County jail. Agent Burkhart described the conversation as "a fishing expedition" by the defendant in an attempt to learn how much the authorities knew regarding the victim's murder. Accordingly, Agent Burkhart terminated the interview. Lieutenant Crews observed Agent Burkhart's initial interview with the defendant, noting "[i]t became very obvious to me that [the defendant] was asking us questions in an attempt to determine who had provided information to us about him."

Agent Burkhart obtained and executed a search warrant for the defendant's cell phone. Over the course of the investigation, Agent Burkhart learned the cell phone numbers of many individuals involved and noted the defendant had Mr. Eddings's, Mr. Gross's, Mr. Allen's, and Ms. Fletcher's cell phone numbers saved in his phone. During the investigation, Mr. Eddings provided his white iPhone 6 to Agent Burkhart. Mr. Eddings's iPhone and the defendant's cracked iPhone were entered into evidence along with a chart of the people of interest to the investigation and their nicknames.

Agent Burkhart agreed there was no physical evidence tying the defendant to the murder. Instead, Agent Burkhart relied on the statements made throughout the investigation and "other evidence" to support arresting the defendant. Agent Burkhart noted Mr. Taylor made three statements and wrote letters to law enforcement. Agent Burkhart did not believe Mr. Taylor's statements contradicted themselves, explaining Mr. Taylor was "very scared" throughout the investigation.

Agent Burkhart learned Mr. Eddings had a silver/chrome and black gun, but it was not uncovered during the investigation. The investigation also revealed Mr. Carney had a black and chrome gun which ended up in Mr. Kelso's possession prior to the murder.

---

[1] Agent Burkhart was unable to identify those persons.

However, Agent Burkhart did not know which gun was actually used in the murder. Both Mr. Taylor and Ms. Denham attempted to lead Agent Burkhart to the murder weapon, but no weapon was recovered. Mr. Eddings told Agent Burkhart that Mr. Gross told him the defendant shot the victim. Agent Burkhart explained that throughout the investigation, nothing indicated Mr. Eddings entered the victim's apartment. As a result, Mr. Eddings was not charged in her murder.

Ms. Eshbaugh provided two statements to Agent Burkhart. In both, Ms. Eshbaugh described Mr. Eddings as having a gun the night of the murder. Ms. Eshbaugh also stated Mr. Eddings had the defendant's cell phone at some point that night which was later returned to the defendant. Ms. Eshbaugh denied knowing what happened the night of the murder but stated the defendant threatened her as they drove back to Tullahoma. Agent Burkhart believed Ms. Eshbaugh clarified her first statement with her second statement. Ms. Denham gave three statements to Agent Burkhart. Agent Burkhart acknowledged discrepancies existed in Ms. Denham's statements due to her fear throughout the investigation. Agent Burkhart acknowledged both Ms. Eshbaugh's and Ms. Denham's cars were involved on the night of the murder, but he refused to label either as getaway cars.

Further, regarding any discrepancies in the witnesses' statements obtained during the investigation, Agent Burkhart noted many of the witnesses were scared, specifically, Ms. Denham and Ms. Eshbaugh. Agent Burkhart stated both Mr. Kelso and Mr. Taylor claimed the defendant threatened Mr. Kelso into shooting the victim. Mr. Taylor told Agent Burkhart that he was scared and, as a result, Mr. Taylor was moved from the Bedford County jail. Mr. Taylor also implicated a man named, "Guta," and stated in his letters that he was scared of Guta. However, Agent Burkhart was unable to identify anyone by that name despite learning the defendant had a "friend" named "Mack Guta" on Facebook.

During redirect and re-cross, Agent Burkhart explained that while Ms. Eshbaugh thought Mr. Eddings had the defendant's cell phone the night of the murder, Mr. Eddings denied having the phone. Ms. Eshbaugh described the phone as a flip phone during a pretrial meeting with the district attorney's office, even though this detail was not reflected in any of Ms. Eshbaugh's statements. A Samsung flip phone that was found on the defendant while in jail was entered into evidence. Agent Burkhart did not know when or by whom the flip phone was purchased or activated.

Amber Fletcher, the defendant's wife of 32 days, testified at trial. However, her testimony was difficult to elicit. Not only did she attempt to invoke the spousal privilege and her Fifth Amendment rights, but she stated that she felt threatened and coerced by the State in testifying and by Agent Burkhart in providing a statement during the

investigation. The trial court conducted a hearing outside of the presence of the jury to determine whether the spousal privilege applied. During the hearing, Ms. Fletcher explained she married the defendant on January 12, 2018. When asked if she gave a statement to Agent Burkhart on October 7, 2015, Ms. Fletcher attempted to invoke her right against self-incrimination. However, after consulting with counsel, Ms. Fletcher cooperated and answered questions from the State, defense counsel, and the trial court regarding her relationship with the defendant and the statement she gave to Agent Burkhart, including that at the time of the statement she was in a relationship with the defendant and pregnant with his child but not married to the defendant. After hearing Ms. Fletcher's responses, the trial court ruled the spousal privilege did not apply as the October 7 statement was made prior to her marriage to the defendant. The State then proceeded with her direct examination.

Throughout her testimony, the State referred to Ms. Fletcher's October 7 statement as Ms. Fletcher could not recall the details of the same. Ultimately, Ms. Fletcher stated on September 13, 2015, the defendant woke her up around 10:00 p.m. at her apartment in Winchester, stating he could not spend the night with her because "[h]e had to go take care of something." In her statement, Ms. Fletcher noted the defendant also told her he would not be able to talk to her on the phone. According to Ms. Fletcher, Mr. Taylor was with the defendant at the time. After the defendant left her apartment, Ms. Fletcher did not see him again until 8:00 a.m. on September 14. That day, Mr. Taylor's mother and girlfriend came to Ms. Fletcher's apartment in search of Mr. Taylor. After they left, the defendant asked Ms. Fletcher to pull up on her cell phone information about a shooting "that happened in Shelbyville." When Ms. Fletcher asked the defendant why he wanted her to do so, the defendant stated "[t]hat he killed the lady." Ms. Fletcher did not ask the defendant any further questions, but noted over the next several days, the defendant urged her not to speak about the "Shelbyville situation." Additionally, in her statement, Ms. Fletcher noted the defendant threatened to kill her and "go after" her family if she told anyone about the murder.

Ms. Fletcher described the defendant's cell phone at the time of the murder as a black iPhone with a crack in it. She believed the defendant had his phone with him on the night of the murder. Ms. Fletcher also stated that at the time of the murder, the defendant carried a silver and black gun with him that he called "a strap."

During cross-examination, Ms. Fletcher stated she met with Agent Burkhart at the Coffee County courthouse in order to give a statement. She was pregnant at the time, and she provided the statement after Lisa Baker, the defendant's ex-wife, encouraged her to do so. At trial, Ms. Fletcher explained she lied to Agent Burkhart in providing the statement. In reviewing her statement, Ms. Fletcher explained she did not remember if the defendant had his cell phone the night of the murder, but she believed she called him

at some point but did not remember speaking to him. When she woke up the next morning, the defendant was in her apartment and had his cell phone with him. Ms. Fletcher testified she did not hear the conversation the defendant had with Mr. Taylor's mother or girlfriend that morning. However, she could not explain why in her statement she claimed she overheard the defendant, Mr. Taylor's mother, and Mr. Taylor's girlfriend discussing the victim's death.

Regarding the circumstances surrounding her statement, Ms. Fletcher believed she was interviewed for about an hour. She stated Agent Burkhart and Assistant District Attorney (ADA) Mike Randles claimed "[t]hat if I didn't stick with exactly what I said, that I could get prosecuted." Ms. Fletcher claimed she told Agent Burkhart that portions of her statement were false, but Agent Burkhart would not let her correct her statement. After making the statement, Ms. Fletcher noted Agent Burkhart and ADA Randles "made her leave the state." She further noted that the night before her trial testimony, Agent Burkhart, District Attorney Robert Carter, ADA Randles, and ADA Richard Cawley told her she could be prosecuted if she did not "stick" to her story. She specifically stated she lied in her statement when she said that the defendant told her he killed the victim and that he always carried a gun.

She further admitted that her cell phone was left on the table during the interview and that the defendant called her numerous times. The State then asked: "In fact, during those calls, at least one of those calls was recorded and [the defendant] said that, quote, he would leave you alone after he killed you and stomped the baby." The defendant objected, arguing the statement was inflammatory and was not produced by the State. The trial court sustained the objection for other reasons, noting the question was leading and assumed facts not in evidence. The State continued, asking Ms. Fletcher, "Let me ask you, do you remember [the defendant] threatening to kill you and stomp the baby out of you?" Ms. Fletcher responded, "I don't remember him saying anything." Ms. Fletcher agreed she would be able to recognize the defendant's voice on a recording, and the State prepared to play the recording of the October 7 phone call between Ms. Fletcher and the defendant. Before doing so, the defendant requested a 404(b) hearing in order to explore the introduction of the recorded phone call, claiming it detailed a crime for which the defendant had not been charged. Additionally, the defendant moved for a mistrial, but the trial court denied the same.

During the 404(b) hearing, Ms. Fletcher agreed her cell phone was on the table in the interview room as she provided a statement to Agent Burkhart. When the defendant repeatedly called her cell phone, Agent Burkhart directed her to answer the call and put it on speaker phone, which Ms. Fletcher did. Ms. Fletcher admitted she knew the defendant was calling her from jail and identified her voice and the defendant's voice on the recording. In the recording, the defendant threatened Ms. Fletcher stating he would kill

her and stomp the baby out of her. After a lengthy discussion with numerous objections and motions made to exclude the recording and any reference to the statement within, the trial court ultimately allowed the State to question Ms. Fletcher regarding the statement. The trial court reasoned the State could use the statement to rebut Ms. Fletcher's allegation that she implicated the defendant in her statement after being coerced by the State. The State then continued with its direct examination of Ms. Fletcher.

Ms. Fletcher stated she had met with the district attorney's office twice during trial. During the first meeting, Ms. Fletcher felt District Attorney Carter "raised his voice and got a little snappy with me." After indicating her October 7 statement was a lie during the meeting, Ms. Fletcher explained that ADA Randles "told me that I could get prosecuted for not getting on the stand and saying exactly what was in my statement and somebody else would be taking care of my kids." As a result, Ms. Fletcher "felt like [her] arm was being twisted." She acknowledged the prosecutors explained that she could be charged with perjury if she lied during her testimony. She also acknowledged District Attorney Carter asked her if she both loved and feared the defendant, but she did not remember answering in the affirmative.

After the second meeting, Ms. Fletcher requested an attorney, and the trial court appointed one prior to the start of trial the next day. Ms. Fletcher maintained she attempted to tell officers the October 7 statement "was not all the way true." Because the statement was not completely true and she was not permitted to correct the statement, Ms. Fletcher felt threatened by the prosecutors' comment that she could be charged if she lied during her testimony.

Ms. Fletcher admitted she was currently on probation which was why she was telling the truth during her testimony, and again stated she lied when she implicated the defendant in the victim's murder. Ms. Fletcher reiterated that she did not feel threatened by the defendant and had never filed a domestic assault charge or an order of protection against him, noting she frequently threatened the defendant herself.

Several experts also testified on behalf of the State and detailed their involvement in the investigation of the victim's murder. As noted above, Agent Gaddes, an expert in trace evidence and a forensic scientist for the TBI, responded to the crime scene on September 14, 2015, in order to assist with shoe impressions found on the door of the victim's apartment. In analyzing the impressions, Ms. Gaddes utilized the Shoe Print Image Capture and Retrieval Data Base (SICAR) and determined the impressions were made by a Reebok Allen Iverson athletic shoe.

Agent Gaddes provided her findings to Agents Burkhart, Utterback, and Winkler and ultimately analyzed a pair of shoes obtained by Agent Burkhart from the Park Trail

Apartments. She compared both class and individual characteristics of the shoes obtained by Agent Burkhart with photographs of the shoe impressions taken from the crime scene and determined they matched.[2]

Dr. Laura Boos, an expert in forensic biology and special agent for the TBI, testified regarding the DNA analysis she performed on several cigarette butts, a sunflower seeds, Mr. Kelso's shoes, and a pair of shorts. Though she performed numerous tests, Dr. Boos did not match the defendant's DNA to any of the profiles she obtained.

Dr. David Zimmerman, an expert in forensic pathology, performed the autopsy of the victim on September 15, 2015. Dr. Zimmerman testified the victim suffered a perforating gunshot wound to the head. The bullet entered the left side of the victim's head and exited the right side of her neck. Soot and gun powder stippling surrounded the entrance wound and allowed Dr. Zimmerman to opine the gun was approximately 1 to 3 feet from the victim's head when fired. Dr. Zimmerman collected bullet fragments from the wound track and noted the victim was shot with a handgun.

Special Agent Jessica Hudson, a forensic scientist with the TBI, testified as an expert in firearms and toolmark identification. She examined the fired cartridge case and bullet found at the crime scene. She determined the items were consistent with a Hornady Critical Duty Brand Ammunition .40 caliber Smith & Wesson cartridge, and the bullet was most likely fired by a Smith & Wesson .40 caliber handgun (SW40VE). Agent Hudson noted Smith & Wesson makes a black and chrome/silver model of this type of handgun. A picture of an example of this type of gun was entered into evidence.

As part of her report, Special Agent Hudson compared the bullet and cartridge case found at the victim's apartment to the evidence she reviewed in Mr. Caruth's case and determined the items did not match. She also explained a fired cartridge case or bullet would likely not retain DNA or fingerprints due to the high temperatures involved in firing a weapon. Special Agent Hudson stated nothing in her analysis of the bullet or the cartridge case linked the defendant to the evidence. She did not analyze any firearms in relation to the bullet or cartridge case and noted several variations of the Smith & Wesson 40VE exist besides the image presented as an example to the jury. She agreed the bullet and cartridge casing could have been fired from a different gun other than the SW40VE but noted "[t]he probability that this particular bullet and cartridge case came from a Smith & Wesson SW40VE is higher than the probability that it did not." The bullet, cartridge case, and Special Agent Hudson's report were entered into evidence.

---

[2] Class shoe characteristics include size, shape, tread design, and general wear while individual characteristics include markings such as "nicks, gouges, [or] scrapes on the bottom of the shoe."

- 21 -

Finally, Ephriam Robinson testified he was currently serving time for a drug conviction but had not been offered any promises in exchange for his testimony. Mr. Robinson, a retired member of the Vice Lords gang, was familiar, in varying capacities, with the victim, the defendant, Mr. Sales, Mr. Kelso, and Mr. Taylor, noting Mr. Taylor is his cousin. Despite their differing gang affiliations, Mr. Robinson did not have any problems hanging out with Mr. Taylor or Mr. Kelso and noted he has been friends with the defendant since the 1990s, most recently seeing him in 2014. Mr. Robinson stated the defendant's nicknames are "Day-Day" and "Mac Day-Day," noting "Mac" is a term used within the Gangster Disciples. Mr. Robinson thought the defendant's wife's name was Lisa.

Mr. Robinson described several conversations he had with the defendant while the two were incarcerated in the Bedford County jail. In June 2017, prior to a hearing in his case, Mr. Robinson was brought to the courthouse and placed in a holding cell with the defendant, Mr. Taylor, Mr. Kelso, and others. While in the cell, the defendant and Mr. Taylor got into an argument, and Mr. Taylor and Mr. Kelso were removed. The defendant then told Mr. Robinson, referring to Mr. Kelso and Mr. Taylor, "if they didn't plead the Fifth when they go to court, that they would be taken care of once they get to prison. He said the only thing that would be able to save them is if they plead the Fifth and they had the paperwork to show that."

On November 20, 2017, Mr. Robinson was again in the holding cell with the defendant. On this occasion, the defendant told him "that he felt bad for having to make Kavaris Kelso shoot his auntie." The defendant explained that "the reason why he had to do it is because [Mr.] Kelso had to show some type of loyalty towards the Gangster Disciples because he let [Mr. Sales] say . . . that he was going to go to Tullahoma and kill every G up there."[3] Additionally, the defendant told Mr. Robinson "that he didn't feel like [Mr. Kelso] deserved the rank because he had to make him, he had to threaten his child and baby mother, his mother's -- his daughter's mother." Finally, while in the holding cell in December 2017, the defendant told Mr. Robinson that "he was filing a motion to get -- to have a -- some girl come and testify on his behalf saying that he was not there." The defendant also told Mr. Robinson that on the night of the victim's murder, the defendant took a gun and cocaine from Mr. Carney.

During cross-examination, Mr. Robinson acknowledged being housed with Mr. Taylor, Mr. Kelso, Mr. Askins, and Mr. Allen and to knowing Mr. Gross, Mr. Carney, Mr. Ransom, Mr. Eddings, and Mr. Sales. He again stated he spoke with the defendant while in the holding cell in June, November, and December of 2017, though he could not

---

[3] Mr. Robinson explained a "G" was a Gangster Disciple.

recall the specific dates. He acknowledged that if the defendant did not have a court date in December 2017, he could not have talked to him that month. Mr. Robinson also thought he spoke with the defendant outside of a store in Tullahoma in 2014. When questioned about how he spoke to the defendant in 2014 if the defendant was in jail that year, Mr. Robinson stated he did not think the defendant was in jail during that time. Regardless of the dates, Mr. Robinson stated he was testifying truthfully.

At the close of the State's proof, the defendant made a motion for a judgment of acquittal and moved to have Ms. Eshbaugh, Ms. Denham, and Mr. Eddings declared as accomplices. The trial court denied both motions, and the defendant proceeded with his proof.

Michelle Murray, the circuit court clerk for Bedford County, testified she maintains the records for all court proceedings, including any appearance, held in juvenile, circuit, and general sessions court. Ms. Murray's records for the defendant did not reflect a court appearance for December 2017 or 2018. During cross-examination, Ms. Murray identified several dockets where the defendant was scheduled to appear. A June 19, 2017, docket listed the defendant, Mr. Gross, Mr. Kelso, Mr. Taylor, and Mr. Robinson. Ms. Murray stated the defendant, Mr. Kelso, and Mr. Robinson were also listed on the August 21, 2017, docket. She stated the defendant, Mr. Askins, Mr. Allen, Mr. Gross, Mr. Maxwell, and Mr. Robinson were listed on the docket for October 16, 2017. Finally, Ms. Murray noted the defendant, Mr. Kelso, and Mr. Robinson were listed on the docket for November 20, 2017. She did not see Mr. Taylor listed on the August, October, or November dockets. Ms. Murray noted, without looking at each individual file, she was unable to determine if any of the defendants listed were actually in court on their scheduled dates.

Finally, the defendant testified, stating he was 32 years old and incarcerated. When not incarcerated, he lived in Winchester with his wife, Ms. Fletcher, and sold drugs in Tullahoma. He has been a member of the Gangster Disciples since he was a teenager and has a criminal history that includes two robbery convictions, a facilitation of aggravated robbery conviction, various drug offenses, being a felon in possession of a firearm, and most recently, charges for introducing contraband into a penal institution and filing a false report to a law enforcement agency.

Despite being a member of the Gangster Disciples, the defendant stated he only knew Mr. Eddings, Mr. Kelso, and Mr. Taylor prior to September 13, 2015. The defendant met Mr. Eddings at Mr. Caruth's funeral, he met Mr. Kelso for "like 5 minutes" at a cookout in Tullahoma in 2015, and he hung out with Mr. Taylor about 4 times in the two weeks prior to the murder. The defendant stated he did not know Mr. Caruth and had never met Mr. Ransom, Mr. Maxwell, or Mr. Carney. He further

explained he is a Nashville Gangster Disciple whereas the other men are from Shelbyville or Fayetteville. Though they are all members of the same gang, members "run with their town" and as a result, the defendant was not familiar with them.

At approximately 5:00 or 6:00 p.m. on September 13, the defendant met Mr. Taylor, Ms. Eshbaugh, Mr. Eddings, and Mr. Allen in a park in Tullahoma in order to sell them cocaine. The group wanted to buy marijuana, and the defendant offered to help them do so. The defendant "jumped in the car with them and drove them . . . around Tullahoma," noting he remained in Tullahoma the entire evening until he returned to Winchester with his brother. The defendant denied going to Shelbyville on September 13, 2015. He testified he did not know how his cell phone got to Shelbyville, claiming "I actually couldn't -- did not have my phone that night. When they called me and I went to them to sell them cocaine, after I left I could not find my phone." However, upon realizing he lost his phone, the defendant did not go back to Tullahoma to try to locate it. Rather, the defendant tried to call the phone but no one answered. On the day after the murder, Mr. Taylor returned the defendant's cell phone to him at his apartment, noting Mr. Taylor lived in the same apartment complex. The defendant provided one written statement to police wherein he denied having any knowledge of the victim's murder, stating he was in Tullahoma that night.

The defendant addressed his relationship with Ms. Sales, the victim's daughter. While in jail, he had a contraband cell phone which he used to access Facebook. He saw posts about the victim's murder that referenced his name. In response to the posts, Ms. Sales made disparaging comments about the defendant which caused him to send her a message asking her to "stop judging" him as he "had nothing to do" with the murder. The defendant continued to have a conversation with Ms. Sales after initiating the same. The defendant stated he does not know Mr. Sales and does not know why Mr. Taylor, Mr. Eddings, Ms. Eshbaugh, Ms. Denham, or Mr. Ransom implicated him in the murder. The defendant testified he was not allowed to be in the "cage" with any of the people involved in the murder and was transferred from the Bedford County jail after his arrest.

The defendant discussed his relationship with Ms. Fletcher, noting she visits him weekly and they talk on the phone daily. While they fight "[l]ike cats and dogs," he does not know why she made false statements against him. The defendant stated that he has never met or spoken with Mr. Robinson and that it would have been "impossible" for Mr. Robinson to have seen him in 2014 because he was incarcerated from 2013 through 2015. He denied seeing Mr. Robinson in court in December 2017, noting he "is not allowed to be around the other guys."

The defendant stated he obtained a flip phone while incarcerated at the Coffee County jail which formed the basis of his charge for introducing contraband into a penal

- 24 -

facility. The defendant denied having a flip phone prior to being in jail and stated he did not own one on the night of the murder.

The defendant claimed he did not know and had never met the victim. He denied directing Mr. Kelso to shoot her, denied providing Mr. Kelso with a gun, and denied going to Mr. Kelso's apartment, Mr. Gross's apartment, the parking lot outside of the victim's apartment, or the victim's apartment. The defendant also denied discussing or meeting with others regarding how to get revenge against Mr. Sales for the murder of Mr. Caruth.

During cross-examination, the defendant again denied knowing Mr. Robinson and asserted Mr. Robinson was guessing when he testified that the defendant's first wife's was named Lisa. The defendant stated Mr. Eddings entered his phone number into the defendant's cell phone when he met him. He reiterated he met Ms. Denham, Ms. Eshbaugh, and Mr. Allen for the first time on September 13, and he met Mr. Askins while in jail. The defendant admitted he had met Mr. Gross but denied having a contact for "Mac Chase Shelbyville" in his cell phone, claiming Agent Burkhart lied regarding his assertion that Mr. Gross's number was saved in the defendant's cell phone.

He also admitted to selling cocaine to Mr. Taylor and then hanging out with the group at the park in Tullahoma. The defendant stated when the group went to find marijuana, he drove Ms. Denham's car. The defendant explained the difference between his testimony and Ms. Denham's on this fact is that Ms. Denham testified that he "drove somewhere I didn't."

The defendant again stated he lost his phone the night of the murder and attempted to call it after realizing the same. However, when the State provided the defendant's cell phone records for his review in order to identify when he attempted to call his missing phone, the defendant stated "You will have to find it. I was -- I don't know them times, I didn't have my phone during them times. I lost my phone once I left them." The defendant argued the State failed to provide his cell phone records prior to 11:13 p.m., but acknowledged he did not request his records from Verizon and did not have proof to support his assertion.

The defendant believed Mr. Taylor, Mr. Eddings, Ms. Eshbaugh, Ms. Denham, and Mr. Ransom all knew each other and implicated him, someone they did not know, as a result. He denied his nickname is "Day Day," claiming it is actually "Little Freaky" or "Mac Day Debiossi." He agreed he was aware Mr. Kelso admitted to shooting the victim in a statement to police. The defendant, however, claimed Mr. Kelso denied the defendant was present when Mr. Kelso shot the victim.

- 25 -

The defendant explained he went to Mr. Caruth's funeral to show respect and because "[s]omebody I knew told me what happened and they asked me if I would go with them." He denied that members of the Gangster Disciples in one area might call members from another area to help after someone is murdered. He stated Mr. Sales' murder of Mr. Caruth was not disrespectful to him, noting Mr. Caruth "was not one of my gang members, he was [Gangster Disciple], but from a different area." However, the defendant stated if a member of another gang killed a member of the Nashville Gangster Disciples, the defendant would feel disrespected. The defendant denied stating, "How you going to let Michael Sales come and say he just killed one and he coming to Tullahoma and kill 2 more." The defendant explained he "was never there to make that statement." He denied having a gun on the night in question and denied making a phone call asking if he needed to be "strapped." The defendant stated Ms. Fletcher testified that her October 7 statement, wherein she claimed the defendant routinely carried a silver and black gun called a "strap," was a lie.

During redirect, the defendant reiterated that he attempted to call his phone prior to 11:13 p.m. on September 13 after realizing it was lost but did not know when he lost the phone. The defendant admitted a collective exhibit of his cell phone records and his TOMIS report into evidence for identification only along with the defendant's records from Coffee County.

After the defendant closed his proof, the jury convicted him as charged. At the subsequent sentencing hearing, the trial court imposed an effective life sentence plus ten years. The defendant filed a motion for a new trial which the trial court denied. This timely appeal followed.

### *Analysis*

#### I.   *Venue*

The defendant argues the trial court erred in denying his motion for a change of venue based upon numerous prospective jurors' pretrial exposure to the case. The State contends the trial court did not abuse its discretion in denying the defendant's motion, noting "[m]ost of the venire generally had only distant recollections of the media coverage, as did the jurors that actually sat on the jury." The State also asserts the defendant failed to properly develop this issue for appellate review. Upon our review, we agree with the State.

A trial court may "order a venue change when a fair trial is unlikely because of undue excitement against the defendant in the county where the offense was committed or for any other cause." Tenn. R. Crim. P. 21(a). "Whether to grant a motion for change

of venue is left to the sound discretion of the trial court, and the court's ruling will be reversed on appeal only upon a clear showing of an abuse of that discretion." *State v. William "Bill" Bosley, Jr.*, No. W2009-00783-CCA-R3-CD, 2010 WL 2219483, at *5 (Tenn. Crim. App. May 27, 2010) (citing *State v. Davidson*, 121 S.W.3d 600, 611-12 (Tenn. 2003)). A change of venue is not warranted simply because a juror has been exposed to pretrial publicity. *Id.* (citing *State v. Mann*, 959 S.W.2d 503, 531-32 (Tenn. 1997)). For this court to reverse a conviction based on a venue issue, the "'defendant must demonstrate that the jurors who actually sat were biased or prejudiced against him.'" *Id.* (quoting *State v. Evans*, 838 S.W.2d 185, 192 (Tenn. 1992)).

Here, the record demonstrates the trial court did not abuse its discretion in denying the defendant's motion for a change of venue. Though the defendant included a transcript of the jury selection process and outlined the allegedly problematic jurors in his brief, he failed to provide any evidence demonstrating that the selected jurors were biased or prejudiced against him. Rather, the defendant generally asserts that eighteen jurors had pre-trial exposure to the case, "including knowledge of what transpired in the trial of the co-defendants, familial relations to the victim or co-defendants, and living in the same neighborhood where these events transpired." The defendant failed to identify which jurors with potential exposure were actually selected for the jury and failed to explain how he was prejudiced by the same. *Bosley*, 2010 WL 2219483, at *5. In denying the defendant's motion, the trial court asserted:

> I think that all of these jurors have demonstrated an ability to set aside what they read and heard, what they were told and whatnot and they are to base their decision on this case based on the evidence presented in the courtroom and the law as I give them. I think we have asked every one of them this.

Nothing in the record warrants a reversal of the trial court's determination. It is clear the defendant has failed to carry his burden as to this issue, and he is not entitled to relief.[4]

Furthermore, the defendant only exercised six peremptory challenges at trial when he was entitled to eight. Tenn. R. Crim. P. 24 (e)(2). As such, and as noted by the State, the defendant failed to use all of his peremptory challenges to remove the jurors complained of, and he is not entitled to relief as a result. *Sommerville v. State*, 521 S.W.2d 792, 797 (Tenn. 1975) (noting "that failure to challenge for cause or if said challenge is not sustained, failure to use any available peremptory challenge to remove the objectionable juror, precludes reliance upon the juror's disqualification upon appeal").

---

[4] We also encourage the defendant to adhere to the formatting requirements of Rule 27 of the Rules of Appellate Procedure by including page numbers in any future briefs submitted to this Court.

- 27 -

## II.    *Sufficiency of the Evidence*

The defendant argues the evidence is insufficient to support his conviction for first degree premeditated murder because the State failed to provide "reliable" evidence to corroborate the testimony of his co-defendants or the witnesses who "should have been co-defendants in this case." The defendant suggests the additional evidence presented by the State failed to tie him to the crimes, including the physical evidence, DNA evidence, video evidence, footprint evidence, and medical evidence, and asserts the cell phone evidence presented "indicated only that a phone, that may have belonged to the defendant was in Shelbyville on the date of the murder." The State contends sufficient proof exists to corroborate all of the challenged testimony, including the defendant's confession to Mr. Robinson and the cell phone evidence.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13 (e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a

convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

At trial, the State relied on a theory of criminal responsibility. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or both." Tenn. Code Ann. § 39-11-401(a). Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2). Criminal responsibility is not a separate crime but "is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999).

The defendant need not physically participate in the crime in order to be criminally responsible. *Phillips v. State*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). To be criminally responsible for the acts of another, the defendant must: "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)). The defendant must "knowingly, voluntarily and

with common intent unite with the principal offenders in the commission of the crime." *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

The jury convicted the defendant of the first degree premeditated murder of the victim. First degree murder is "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). In this context, premeditation is "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Tennessee Code Annotated section 39-13-202(d) further states:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006) (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997)). The Tennessee Supreme Court has identified certain factors which tend to support a finding of premeditation, including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)). *Bland* does not include an exhaustive list of factors for consideration when finding premeditation. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). A conclusion the killing was premeditated may also be supported by the nature of the killing or evidence establishing a motive. *Id*. Likewise, lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013) (internal citations omitted).

In attacking the sufficiency of the evidence as to his first degree premeditated murder conviction, the defendant argues that no physical evidence tied him to the murder and that the State failed to corroborate his co-defendants' testimony. The record, however, does not support this argument. Rather, the evidence shows the defendant was aware Mr. Sales killed Mr. Caruth on September 6, 2015. The defendant attended Mr. Caruth's funeral where he discussed locating Mr. Sales with Mr. Eddings, Mr. Taylor, and Mr. Askins. On September 13, 2015, the defendant told Ms. Fletcher he had to "take

- 30 -

care of something" before leaving to meet Mr. Taylor, Mr. Eddings, Mr. Askins, Ms. Denham, and Ms. Eshbaugh at a park in Tullahoma. Upon the defendant's urging, the group drove to Shelbyville to discuss a comment Mr. Sales made to Mr. Kelso about killing members of the Gangster Disciples and, ultimately, to seek revenge for Mr. Caruth's murder.

The group made several stops in Shelbyville in their effort to locate Mr. Sales, and their general movements were captured on surveillance footage presented at trial. After stopping at a gas station, the group went to Mr. Gross's apartment, and Mr. Gross led them to Mr. Kelso's apartment. At Mr. Kelso's apartment, Mr. Taylor and Mr. Ransom overheard the defendant ask Mr. Kelso, "How you going to let Michael Sales come and say he just killed one and he coming to Tullahoma and kill 2 more." The defendant also handed Mr. Kelso a gun which Mr. Kelso placed in his hoodie.

The group then set out to find Mr. Sales. Mr. Kelso, the victim's nephew, led the group to the victim's apartment. The group then parked in the neighboring parking lot at the Southgate Apartments. The defendant told Ms. Eshbaugh and Ms. Denham to back into the parking spots in order to be able to leave easily when the group returned to the cars. As the group approached the victim's apartment, Mr. Taylor testified the defendant instructed Mr. Kelso to knock on the door to find out if Mr. Sales was in the apartment. Mr. Ransom testified the defendant told Mr. Kelso to kick in the door, which Mr. Kelso did, and the group forced their way inside the apartment. As the victim sat down on the couch, Mr. Kelso and the defendant stood in front of her, and Mr. Kelso twice demanded the location of Mr. Sales. When the victim failed to provide an answer, Mr. Kelso pulled out a gun, looked at the defendant, and shot the victim in the head. Dr. Zimmerman's autopsy revealed the victim suffered a single gunshot wound to the head, and a bullet and shell casing were found in the victim's apartment. Agent Burkhart testified both Mr. Kelso and Mr. Taylor stated the defendant threatened Mr. Kelso before Mr. Kelso shot the victim.

Two neighbors heard activity coming from the victim's apartment. Ms. Robertson heard a "pop" at approximately 12:11 or 12:14 a.m., and Mr. Colon heard footsteps running down the stairs before 1:00 a.m. The surveillance footage shows the Rogue, Malibu, and Mercedes traveling towards the victim's apartment at approximately 12:40 a.m. as they neared the Southgate Apartments. The defendant's cell phone records placed the defendant less than a mile from the victim's apartment at approximately 11:38, 11:41, 11:54, and 11:57 p.m.

After the murder, Ms. Denham testified the defendant referenced Mr. Caruth's murder and stated, "Kelso beat that n*****'s ass." Ms. Denham also stated she felt threatened by the men involved in the murder. Similarly, Ms. Eshbaugh testified the

defendant threatened her and told her not to tell anyone they were in Shelbyville on September 13, 2015. In addition, the morning after the murder, the defendant asked Ms. Fletcher to search for information about the victim's murder because "he killed the lady" and told her not to mention the "Shelbyville situation" to anyone. During interviews with Agent Burkhart, Mr. Kelso admitted to killing the victim, and Mr. Taylor, Mr. Eddings, Mr. Ransom, Ms. Denham, and Ms. Eshbaugh all placed the defendant at the crime scene.

Looking specifically to the premeditation factors outlined by our Supreme Court, the record establishes the defendant expressed his desire to seek revenge after Mr. Sales killed Mr. Caruth and bragged about the same. The defendant was upset by the comment Mr. Sales made to Mr. Kelso and sought out Mr. Kelso in order to address the situation. In doing so, the defendant and his co-defendants forced their way into the victim's apartment in the early morning hours of September 14, 2015, armed with a gun. The victim was unarmed and surrounded by the men demanding to know where her son was. When she failed to provide an answer, Mr. Kelso shot her in the head at the defendant's direction. After killing the victim, the defendant returned home. The next morning, the defendant asked his wife to look on the internet for information about the victim's murder. *See Bland*, 958 S.W.2d at 660. The record makes clear the defendant participated in the shooting death of the victim on September 14, 2015, after spending the evening attempting to locate Mr. Sales. As such, the record supports the jury's finding of premeditation in that the defendant participated in the death of the victim "after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202 (d). The defendant is not entitled to relief.

In support of his challenge to the sufficiency of evidence presented at trial, the defendant contends there has been no corroboration implicating him apart from accomplice testimony. We disagree. The defendant is correct that, when the only proof of a crime is the uncorroborated testimony of one or more accomplices, then the evidence is insufficient to sustain a conviction as a matter of law. *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013) (citing *State v. Little*, 402 S.W.3d 202, 211-12 (Tenn. 2013)). Additionally, accomplices cannot corroborate each other. *State v. Boxley*, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001). This Court has defined the term "accomplice" to mean "one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime." *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). This means that the person must do more than have a guilty knowledge, be morally delinquent, or participate in other offenses with the principal actor. *State v. Jackson*, 52 S.W.3d 661, 666 (Tenn. Crim. App. 2001). The test for whether a witness qualifies as an accomplice is "whether the alleged accomplice could be indicted for the same offense charged against the defendant." *Allen*, 976 S.W.2d at 666.

Although a defendant cannot be convicted solely upon the uncorroborated testimony of an accomplice, our Supreme Court has noted that the corroboration required can be slight. The Court stated that in order to properly corroborate accomplice testimony:

> [t]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. The corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's [testimony].

*State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)).

Moreover, independent evidence, although slight and entitled to little weight when standing alone, is sufficient to corroborate accomplice testimony. *State v. Heflin*, 15 S.W.3d 519, 524 (Tenn. Crim. App. 1999). However, evidence that merely casts suspicion on the accused is inadequate to corroborate an accomplice's testimony. *Boxley*, 76 S.W.3d at 387. The sufficiency of the corroboration is a determination entrusted to the jury as the trier of fact. *Shaw*, 37 S.W.3d at 903.

At trial, both Mr. Robinson and Ms. Fletcher testified the defendant confessed to participating in the victim's murder. While in jail, Mr. Robinson stated the defendant told him that he felt bad for making Mr. Kelso kill his aunt, but that Mr. Kelso had to demonstrate his loyalty to the Gangster Disciples. The defendant also told Mr. Robinson he had to threaten Mr. Kelso into killing the victim. Agent Burkhart testified both Mr. Taylor and Mr. Kelso stated the defendant threatened Mr. Kelso prior to the shooting. The Tennessee Supreme Court "has recognized that accomplice testimony and a defendant's confession may corroborate one another." *State v. Jose Lemanuel Hall*, No. M2013-02090-CCA-R3CD, 2014 WL 4384318, at *10 (Tenn. Crim. App. Sept. 5, 2014) (citing *Witham v. State*, 232 S.W.2d 3 (Tenn. 1950) ("The confessions were admissible in evidence to corroborate the testimony of the accomplice which, in turn and to the same extent, corroborates the confessions.")). The testimony of Mr. Robinson and Ms. Fletcher, two non-accomplices, sufficiently identified the defendant as a participant in the victim's murder and corroborated the testimony of the accomplices who testified at trial.

- 33 -

In addition to the above-outlined corroborating evidence, Ms. Denham, Ms. Eshbaugh, and Mr. Eddings all testified the defendant traveled from Tullahoma to Shelbyville in Ms. Denham's Malibu. Agent Vallee tracked the defendant's cell phone from Tullahoma to Shelbyville and placed the defendant's cell phone near the victim's apartment around the time of the murder. Detective Jacobs identified the Malibu driving throughout Shelbyville, including the area of the victim's apartment, on surveillance footage prior to the murder. The evidence, as outlined more thoroughly above, also corroborated the defendant's confession to Mr. Robinson and Ms. Fletcher, and the testimony of Mr. Taylor and Mr. Ransom. The defendant is not entitled to relief as to this issue. Any discrepancies in the testimonies do not prohibit a finding of corroboration as it was within the province of the jury to determine what evidence it found credible regarding a finding of sufficient corroboration. *Id.*

Finally, we note, the defendant does not challenge his convictions for aggravated burglary or first degree felony murder, and instead argues the evidence was insufficient to sustain his conviction for conspiracy to commit first degree murder for which he was not charged or convicted. Regardless, based upon the foregoing reasoning, we conclude the evidence is sufficient to sustain the defendant's convictions for aggravated burglary and first degree felony murder.

### III.     *Jury Instructions and Accomplices*

The defendant asserts the trial court erred in failing to declare Cory Eddings, Marie Eshbaugh, or Lakisha Denham as accomplices or co-defendants as a matter of law. The State insists the trial court "properly left it to the jury" to determine if these witnesses were accomplices based upon the disputed evidence produced at trial regarding their knowledge of the crimes. Further, the State contends any error in instructing the jury was harmless as their testimony was corroborated by the defendant's confession to Mr. Robinson and the cell phone tracking proof.

As previously noted, an accomplice is "one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime." *Allen*, 976 S.W.2d at 666. The facts of each particular case, as introduced at trial, regulate whether the jury or the trial court determines if a person is an accomplice. *State v. Griffis*, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997) (citing *Bethany v. State*, 565 S.W.2d 900, 903 (Tenn. Crim. App. 1978)). "When the undisputed evidence clearly establishes the witness is an accomplice as a matter of law, the trial court, not the jury, must decide the issue. *Id.* (citations omitted). However, when the evidence presented "is unclear, conflicts, or is subject to different inferences, the jury, as the trier of fact, is to decide if the witness was an accomplice." *Id.* (citations omitted). Upon a finding that a witness

was an accomplice, "the jury must decide whether the evidence adduced was sufficient to corroborate the witness's testimony." *Id.* (citations omitted).

In the defendant's case, the trial court allowed the jury to determine the accomplice status of Ms. Denham, Ms. Eshbaugh, and Mr. Eddings. While it is undisputed that neither Ms. Denham, Ms. Eshbaugh, nor Mr. Eddings were in the victim's apartment during her murder, it is also undisputed that Ms. Denham, Ms. Eshbaugh, and Mr. Eddings traveled with the defendant and his co-defendants prior to, during, and after the murder. However, the evidence detailing their involvement in and degree of knowledge of the murder was unclear, conflicting, and subject to different inferences.

Ms. Denham testified she did not know why the defendant wanted to go to Shelbyville when they were at the park in Tullahoma. When she refused to drive him, the defendant drove her car to Shelbyville, retained control of her keys, and refused to take her home. Ms. Denham testified she drove away from the victim's apartment after the murder but did not know what happened at the time, claiming she did not learn about the murder until she was questioned by police. Mr. Eddings testified he thought the group was looking for Mr. Sales in order to beat him up. When the group parked near the victim's apartment, he did not know who lived inside or "what the game plan was," but he did not go inside because he did not want to be involved in the group's activity. Ms. Eshbaugh testified she thought the group was going to a party in Shelbyville the night of the murder, and Mr. Eddings confirmed Ms. Eshbaugh did not know what the group was planning to do that night. Ms. Eshbaugh noted that Mr. Kelso directed her to the victim's apartment and that the defendant instructed her to back into a parking space and follow the Mercedes when the group left the victim's apartment. Though Mr. Eddings denied having a gun, Ms. Eshbaugh testified Mr. Eddings put a black and chrome gun in her glove box, noting her statement indicated Mr. Eddings took the gun into both Mr. Gross and Mr. Kelso's apartments. Ms. Eshbaugh and Mr. Eddings each testified they learned of the victim's murder the day after it happened. Agent Burkhart testified Ms. Denham and Ms. Eshbaugh were scared throughout the investigation and acknowledged numerous discrepancies in their statements. He did not consider the Rogue or the Malibu to be getaway cars. Finally, neither Ms. Denham, Ms. Eshbaugh, nor Mr. Eddings were charged in the victim's murder.

Accordingly, the record reflects the trial court properly instructed the jury by allowing the jury to determine whether Ms. Denham, Ms. Eshbaugh, or Mr. Eddings were accomplices to the murder as the evidence describing their involvement in the same was unclear, conflicting, and subject to different inferences. *Griffis*, 964 S.W.2d at 588. This Court presumes the jury followed the trial court's instructions. *State v. Joshua R.*

*Starner*, No. M2014-01690-CCA-R3-CD, 2016 WL 1620778, at *21 (Tenn. Crim. App. Apr. 20, 2016) (citing *State v. Young*, 196 S.W.3d at 111; *Shaw*, 37 S.W.3d at 904).

In addition and based upon our foregoing analysis, in the event the jury determined Ms. Denham, Ms. Eshbaugh, or Mr. Eddings to be an accomplice, the record is replete with evidence corroborating their testimony, including the surveillance footage, the records pinpointing the location of the defendant's cell phone, the defendant's testimony regarding who he met in the park, and Ms. Fletcher's testimony concerning the defendant's admission of guilt after the murder. *Id.* The defendant is not entitled to relief.

## IV. The Defendant's Threat

The defendant argues the trial court erred in allowing the State to question Ms. Fletcher about the defendant's threatening to kill her and stomp the baby out of her. The defendant argues the statement was prejudicial, non-probative, and not relevant to his trial. The State contends the trial court properly allowed the testimony for impeachment purposes after Ms. Fletcher claimed investigators coerced her into giving a statement implicating the defendant and failing to recall the statement the defendant made to her during her testimony. The State asserts the impeachment was not unfairly prejudicial and noted the defendant opened the door to this line of testimony by questioning Ms. Fletcher about the police presence during her statement. Finally, the State contends the defendant's threat was relevant to the trial and did not affect the verdict as the trial court provided a limiting instruction to the jury. We agree with the State.

It is well-settled that "[t]he right to explore or examine witnesses for bias is a fundamental right." *State v. Sayles*, 49 S.W.3d 275, 279 (Tenn. 2001) (citation omitted). "The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the discretion of the trial court." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995) (citations omitted). This Court will uphold the trial court's determination absent an abuse of discretion. *Sayles*, 49 S.W.3d at 279.

Here, the record indicates Ms. Fletcher implicated the defendant in the victim's murder in a statement given to Agent Burkhart on October 7, 2015. At trial and upon questioning by the defendant, Ms. Fletcher asserted her statement to Agent Burkhart was false and alleged Agent Burkhart coerced her into giving the same, thus calling her credibility into question. As such, the trial court allowed the State to question Ms. Fletcher about the threat the defendant made to her during a phone call she received from him during the interview. During the phone call, the defendant threatened to "kill [Ms. Fletcher] and stomp the baby out of her." The trial court reasoned the State could use the defendant's statement to rebut Ms. Fletcher's allegation that Agent Burkhart coerced her

into implicating the defendant in the murder in an effort to expose Ms. Fletcher's bias. *Sayles*, 49 S.W.3d at 279; *Dishman*, 915 S.W.2d 458, 463. Ultimately, Ms. Fletcher admitted at trial that the defendant called her during the interview, she put the call on speaker phone, and the defendant threatened to kill her and stomp the baby out of her. After this testimony, the trial court provided a limiting instruction to the jury:

> Ladies and gentlemen of the jury; the statement that you heard, or the threat that was just conveyed to you by this witness is not to be used to determine this defendant's guilt or innocence in this matter, okay, as inflammatory as perhaps as it may be or distasteful, you cannot use it to determine his guilt or innocence. It is simply used to determine the truthfulness or the motivation to either tell the truth or fabricate the story on October the 7th, 2015, in a statement that she gave to the TBI agent and other law enforcement personnel. Is anybody here who cannot follow that instruction? Okay. So I'm going to reiterate that the statement cannot be used to determine the defendant's guilt or innocence in this case. All right? And everybody has indicated they can follow the [c]ourt's instruction.

Upon our review, we conclude Ms. Fletcher's testimony was relevant to demonstrate any bias she harbored, and the trial court properly allowed this line of testimony for the limited purpose of identifying the same. In doing so, the trial court provided a limiting instruction regarding the testimony which we presume the jury followed. *Joshua R. Starner*, 2016 WL 1620778, at *21 (citations omitted). Accordingly, the defendant has failed to establish the trial court abused its discretion in permitting the testimony. The defendant is not entitled to relief.

## V.    *Motion for a Mistrial*

Similarly, the defendant argues the trial court erred in denying his motion for a mistrial after the State introduced evidence that the defendant threatened to kill Ms. Fletcher and stomp the baby out of her. The State asserts the trial court did not err in denying the motion as the trial court provided a limiting instruction regarding the statement, it did not affect the verdict, and the discussion about the phone call was had off the record. We agree with the State.

In Tennessee, a mistrial "should be granted 'only in the event of a manifest necessity that requires such action.'" *State v. Leath*, 461 S.W.3d 73, 100 (quoting *State v. Hall*, 976 S.W.2d 121, 147 (Tenn. 1998) (appendix) (internal quotations omitted)). The burden of establishing a "manifest necessity" lies with the party seeking the mistrial. *Id.* (citing *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)). However, the

decision to grant a mistrial lies with the discretion of the trial court which will be reviewed for abuse of discretion. *Id.*

The defendant argues a mistrial was warranted because the jury heard testimony regarding a statement he made to Ms. Fletcher wherein he threatened to kill her and stomp the baby out of her. The record, however, does not support this argument as it indicates the State only introduced this evidence in an effort to rebut Ms. Fletcher's allegation that she was coerced into giving a statement by law enforcement. Further, our review of the record indicates the trial court did not allow the State to play the recording of the defendant threatening Ms. Fletcher and provided a limiting instruction regarding the statement, as noted above. For these reasons, nothing in the record suggests a manifest necessity exists in this instance to warrant a mistrial as the defendant has failed to provide specifics as to how the statement prejudiced his trial. The overwhelming amount of evidence of the defendant's guilt also weighs against a finding of manifest necessity. Accordingly, the trial court did not abuse its discretion in denying the defendant's motion for a mistrial. The defendant is not entitled to relief.

### *Conclusion*

Based upon the foregoing authorities and reasoning, the judgments of the trial court are affirmed. However, we remand the case to the trial court for the entry of a completed judgment form as to count 3.

_____
J. ROSS DYER, JUDGE